IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CHRISTIANA EVICK,            :
                                   :
             Petitioner,         :
                                     :
       v.                      :       Civil Action No. 18-395-RGA
                                     :
WENDI CAPLE, Warden, and     :
ATTORNEY GENERAL OF THE    :
STATE OF DELAWARE,        :
                                     :
            Respondents.     :

---

## MEMORANDUM OPINION

Christiana Evick.  *Pro se* Petitioner.

Carolyn S. Hake, Deputy Attorney General of the Delaware Department of Justice, Wilmington, Delaware.  Attorney for Respondents.

February 12, 2021
Wilmington, Delaware

/s/ Richard G. Andrews
ANDREWS, UNITED STATES DISTRICT JUDGE:

Pending before the Court is a Petition for a Writ of Habeas Corpus and an Amended

Petition (hereinafter collectively referred to as "Petition") filed by Petitioner Christiana Evick.

(D.I. 2; D.I. 6)  The State filed an Answer in opposition, asserting that the Petition should be

dismissed in its entirety as time-barred or, alternatively, as procedurally barred.  (D.I. 14)

Petitioner filed a Reply, essentially re-asserting the claims presented in her Petition and

providing additional details about her state of mind at the time of the crimes and guilty plea.

(D.I. 26)  For the reasons discussed, the Court will deny the Petition as barred by the limitations

period prescribed in 28 U.S.C. § 2244.

## I.  BACKGROUND

### A. Factual Background

As summarized in the State's Answer,[1] the facts leading up to Petitioner's conviction are

set forth below:

> Harvey and Carolyn Cashwell resided in a rural part of Sussex
> county.  They were murdered in their home in April, 2012.  Both
> victims were shot with a small caliber firearm, which appeared to
> be 22 caliber. The Cashwells had a large amount of cash in their
> home. That cash, as well as firearms and jewelry, including a
> $14,000 Marquise-cut diamond ring, with a laser engraved serial
> number, were stolen.
>
> Delaware State Police ("DSP") officers investigating the murders
> learned that approximately six months before the murders, Emory
> and his girlfriend [Petitioner] rented a residence from the
> Cashwells, which was located directly next door to the Cashwell's
> house. The rental ended on bad terms with both Emory and
> [Petitioner] being evicted.

---

[1]Petitioner's charges resulted in a guilty plea.  Therefore, the Court relies on the State's summary
of the facts, which are taken from the probable cause affidavit, court filings, the truth-in-
sentencing form, and transcripts of the plea and sentencing.  (D.I. 14 at 3 n. 12)

While investigating the murders, DSP discovered that Emory had pawned an expensive large Marquise-cut diamond ring at a jeweler in Georgetown, Delaware on April 23, 2012 for $4,300. The jeweler had contacted police after discovering an engraved serial number on the ring, because, although Emory had told him the ring belonged to his grandmother and was at least 40 years old, the jeweler did not believe such technology existed 40 years ago. The jeweler also informed DSP that Emory tried to sell him a white gold wedding or anniversary band with a double row of diamonds, but Emory had refused the jeweler's offer. The jeweler provided police with a photograph of that gold ring, and family members of the Cashwells later identified the ring as belonging to Carolyn Cashwell.

DSP interviewed Emory, and he told police he found the Marquise-cut diamond ring that he pawned under a bench while he was in court with [Petitioner] on April 23, 2012. He told police that he got $4,000 for the ring. Emory denied attempting to sell another ring to the jeweler.

DSP discovered that Emory had been incarcerated at Sussex Correctional Institution in Georgetown from approximately March 13, 2012 until April 21, 2012. During his incarceration, there were numerous phone calls between him and [Petitioner], where they discussed that they had no money and could not raise the $700 necessary to post Emory's bail. Emory also discussed with [Petitioner] his "plan" to get a lot of money as soon as [Petitioner] bailed him out of prison. During one of the calls, [Petitioner] expressed that she was going to steal a gun to get him out. During another call, Emory told [Petitioner] to get that "thing" in the camper and make sure it had shells, and he promised [Petitioner] that he would get them a new house upon his release.

When interviewed by DSP, [Petitioner] admitted to hiding Emory's Remington Nylon 66 .22 caliber rifle in a camper at an acquaintance's residence after the murders occurred. Police subsequently recovered a gun from the camper. Ballistics testing revealed the gun to be consistent with the type of weapon used in the murders. Police also found a t-shirt with the word "POLICE" among Emory's possessions, which contained blood splatter commonly associated with blowback from a close range shooting.

On April 21, 2013—the day Emory was released from prison and the day police believed the murders took place, cellular telephone

tower records indicated that Emory and [Petitioner] were in the vicinity of the Cashwell residence, between the hours of 2048 and 2200 hours. Beginning at 2200 hours that day, Emory and [Petitioner] both traveled north to the Newark area. At approximately 2330 hours on April 21, 2013, Emory and [Petitioner] rented a room at a hotel near Bear, Delaware for approximately $184 in cash.

Video surveillance from April 23, 2013 at another hotel in Harrington, Delaware showed [Petitioner] holding the door open for Emory while he carried an Afghan blanket containing several long guns into the hotel.  Family members of the murder victims later identified the blanket as belonging to Carolyn Cashwell. Surveillance video from the hotel also showed [Petitioner] and Emory leaving the hotel a short time later and Emory carrying what appears to be a .22 caliber rifle.

Between April 22, 2012 and April 27, 2012, Emory and [Petitioner] made numerous cash purchases for themselves and their children, including purchases at Walmart and the Farmers Market in New Castle County on April 22, 2012; a 1992 Chevy Blazer; and $1500 worth of jewelry at MLH Treasures in Harrington, Delaware.

The owner of MLH Treasures told police Emory and [Petitioner] paid with $100 dollar bills. Emory and [Petitioner] also rented hotel rooms in Harrington on April 23, 2012 and in Greenwood, Delaware between April 26, 2012 and May 2, 2012, paying cash each time and with $100 dollar bills in Greenwood.

In early May 2012, DSP were contacted by Melinda McKinney ("McKinney"). McKinney told police that both Emory and [Petitioner] had contacted her and implied that they had stored money on her property.  While [Petitioner] was in prison for an unrelated arrest, [Petitioner] called McKinney on May 10, 2012. During the recorded prison call, [Petitioner] told McKinney that she had enough money to hire Emory an attorney if she could make bail.  [Petitioner] also asked McKinney if police recovered a lot of cash when McKinney told her that police searched the property.

During another recorded prison call, [Petitioner] phoned Michael King ("King") and asked King to post $4,000 to bail her out of prison.  [Petitioner] told King that she had a lot of money, but that

3

she needed to be released to access it. [Petitioner] also stated that she had even offered someone named "Brian" $2,000 to go to McKinney's and retrieve her money. On May 18, 2012, police searched McKinney's property and found approximately $50,000 cash in a seat of a camper.

DSP subsequently arrested Emory and [Petitioner] and charged them with multiple counts of murder in the First Degree and related robbery and burglary offenses. The State indicated that it would seek the death penalty against only Emory. On September 11, 2013, before [Petitioner's] final case review, Emory provided a proffer of his involvement in the homicides. Following that proffer, the prosecutors agreed to not pursue the death penalty against Emory. In exchange, Emory pled guilty to the indictment.

During Emory's proffer, Emory told prosecutors that he entered the Cashwell residence through a garage door, murdered Harvey Cashwell as he lay on the couch watching television, and then turned the gun on Carolyn Cashwell as she emerged from the back bedroom. Emory then robbed the Cashwells of cash, jewelry, and firearms before leaving the home. Emory told prosecutors it was not necessarily his plan to murder the Cashwells but he was prepared to kill them if necessary. Emory also told prosecutors that he never told [Petitioner] of his plan to rob and possibly harm the Cashwells. Instead, Emory claimed that [Petitioner] picked him up in Bridgeville after he was released from prison and they went to his aunt's house. Emory told prosecutors that, unbeknownst to [Petitioner], he placed a bag with a rifle in the backseat of [Petitioner]'s vehicle while she was inside his aunt's house. Emory stated that after they left his aunt's house, he instructed [Petitioner] to take him to "Hickman," which is essentially an abandoned town located at the crossroads very close to the Cashwell residence. Emory claimed that he told [Petitioner] that he was going to meet a guy named "John," and told [Petitioner] it was none of her business when she pressed for details. Upon arriving at "Hickman," Emory said that [Petitioner] dropped him off near the scene of the crime. When Emory got out of the vehicle, he retrieved a bag from the backseat and [Petitioner] became aware that Emory was in possession of a rifle. Emory stated that [Petitioner] said, "What the fuck is that for?" when she saw the firearm. Emory told her he needed the gun for protection and told [Petitioner] to "drive down to the state park" and he would call later for her to come back and pick him up. Emory also revealed that he had a ski mask hidden in his pants pocket, which

4

he never showed [Petitioner]. About an hour later, Emory summoned [Petitioner] to pick him up at the end of one of two driveways leading to the Cashwell property. When [Petitioner] arrived, she observed Emory with a blanket wrapped around a number of firearms. Emory stated that [Petitioner] frantically stated "Oh my God Mike, what the fuck did you do?" Emory told her to shut up and drive. [Petitioner] asked him where "John" was and he told her John was still inside, obviously referring to the Cashwell home. Emory told prosecutors that he never told [Petitioner] about the cash he stole from inside the Cashwell home. During the next few days, Emory and [Petitioner] travelled to New Castle to visit with their children and then returned downstate. When word reached them that the Cashwells had been murdered, Emory said that [Petitioner] encouraged him to contact the police thinking he could lead them to "John" who she believed must have committed the murders. Emory told [Petitioner] that he could not risk cooperating with authorities because he had helped John commit the burglary. Emory told prosecutors he told [Petitioner] that he was paying for the various hotels, meals and clothes they purchased with the money he obtained from pawning the ring he stole during the robbery. Emory also said that he never told [Petitioner] exactly how much money he received and instead kept the money on his person. Finally, Emory said he never told [Petitioner] of his involvement in the murders.

(D.I. 14 at 3-9)

## B. Procedural Background

In January 2013, Petitioner was indicted on two counts of first degree murder (felony murder), one count of first degree burglary, two counts of first degree robbery, one count of first degree burglary, one count of felony theft (> $50,000), one count of first degree conspiracy, and four counts of possession of a firearm during the commission of a felony ("PFDCF"). (D.I. 14 at 1; D.I. 15-2 at 31) On September 18, 2013, Petitioner pled guilty to two counts of criminally negligent homicide and one count each of first degree burglary, first degree robbery, felony theft, and PFDCF. (D.I. 15-3 at 23-41) The Superior Court sentenced Petitioner on November 1, 2013 to a total of fifty-nine years at Level V, to be suspended after thirty-six years for one year at

Level IV confinement, followed by lesser levels of supervision.  (D.I. 15-3 at 101-108)

Petitioner did not file a direct appeal.

On September 16, 2015, Petitioner filed a *pro se* motion for postconviction relief

pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion").  (D.I. 15-3 at 109-

130)  The Superior Court denied the Rule 61 motion on April 29, 2016.  (D.I. 15-2 at 30-41)  The

Delaware Supreme Court affirmed that decision on March 15, 2017.  (D.I. 15-4 at 1-4); *Evick  v.*

*State*, 158 A.3d 878 (Table), 2017 WL 1020456 (Del. Mar. 15, 2017).

On October 17, 2016, while her Rule 61 appeal was pending, Petitioner filed in the

Superior Court a motion to modify her sentence to amend the no-contact order with her co-

defendant Emory.  (D.I. 15-5)  On November 23, 2016, the Superior Court ruled that it lacked

jurisdiction to rule on the motion because of the pending appeal.  (D.I. 15-6)  On June 7, 2017,

after the appeal was decided, Petitioner filed a letter clarifying that the October 17, 2016 motion

sought to amend the no-contact order with Emory due to the well-being of her children.  (D.I. 15-

7)  On June 26, 2017, the Superior Court informed Petitioner that there was no

misunderstanding, but rather, the court did not rule upon the October 2016 motion because the

court lacked jurisdiction due to the appeal.  (D.I. 15-1 at 6, Entry No. 58)

Petitioner placed the instant habeas Petition in the prison mailing system on March 5,

2018 (D.I. 2 at 15), and then she filed an amended Petition on August 13, 2018 (D.I. 6).  The

Petition asserts the following six grounds for relief: (1) trial counsel provided ineffective

assistance by failing to advise Petitioner that her conduct did not constitute the offenses charged;

(2) trial counsel provided ineffective assistance by coercing her to plead guilty; (3) trial counsel

provided ineffective assistance by failing to object when the judge sentenced her with a closed

6

mind; (4) trial counsel provided ineffective assistance by failing to file a motion for reduction of

sentence within ninety days of sentencing or a motion to withdraw the plea; (5) she was "overly

medicated" when she pled guilty and at sentencing; and (6) she has "new evidence" that Emory

was "dishonest" when he gave his statement/confession about the crimes.  (D.I. 6)

## II.    ONE YEAR STATUTE OF LIMITATIONS

AEDPA prescribes a one-year period of limitations for the filing of habeas petitions by

state prisoners, which begins to run from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  AEDPA's limitations period is subject to statutory and equitable tolling.

*See Holland v. Florida*, 560 U.S. 631 (2010) (equitable tolling); 28 U.S.C. § 2244(d)(2)

(statutory tolling).

Petitioner does not assert, and the Court cannot discern, any facts triggering the

application of § 2244(d)(1)(B), (C), or (D).  Consequently, the Court concludes that the one-year

period of limitations began to run when Petitioner's convictions became final under

§ 2244(d)(1)(A).

Pursuant to § 2244(d)(1)(A), if a state prisoner does not appeal a state court judgment, the judgment of conviction becomes final, and the statute of limitations begins to run, upon expiration of the time period allowed for seeking direct review. *See Kapral v. United States*, 166 F.3d 565, 575, 578 (3d Cir. 1999); *Jones v. Morton*, 195 F.3d 153, 158 (3d Cir. 1999).  In this case, the Superior Court sentenced Petitioner on November 1, 2013.  Since Petitioner did not appeal that judgment, her conviction became final on December 2, 2013, when the time to appeal expired.[2]  Applying the one-year limitations period to that date, Petitioner had until December 2, 2014, to timely file a habeas petition. *See Wilson v. Beard*, 426 F.3d 653, 662-64 (3d Cir. 2005) (Fed. R. Civ. P. 6(a) applies to AEDPA's limitations period); *Phlipot v. Johnson*, 2015 WL 1906127, at *3 n. 3 (D. Del. Apr. 27, 2015) (AEDPA's one-year limitations period is calculated according to the anniversary method, *i.e.*, the limitations period expires on the anniversary of the date it began to run).  Petitioner, however, did not file the instant Petition until March 5, 2018,[3] more than three years after that deadline.  Thus, the Petition is time-barred and should be dismissed, unless the limitations period can be statutorily or equitably tolled. *See Jones,* 195 F.3d at 158.  The Court will discuss each doctrine in turn.

---

[2]The thirty-day appeal period actually expired on December 1, 2013, which was a Sunday. Therefore, the appeal period extended through the end of the day on December 2, 2013. *See* Del. Sup. Ct. R. 11(a).

[3]Pursuant to the prison mailbox rule, a *pro se* prisoner's habeas petition is deemed filed on the date she delivers it to prison officials for mailing. *See Longenette v. Krusing*, 322 F.3d 758, 761 (3d Cir. 2003).  Therefore, the Court adopts March 5, 2018 as the date of filing, since that is the date on Petitioner's certificate of mailing in her original Petition.  (D.I. 2 at 15)

### A.  Statutory Tolling

Pursuant to § 2244(d)(2), a properly filed state post-conviction motion tolls AEDPA's limitations period during the time the motion is pending in the state courts, including any post-conviction appeals, provided that the motion was filed and pending before the expiration of AEDPA's limitations period.  *See Swartz v. Meyers*, 204 F.3d 417, 420-24 (3d Cir. 2000).  The limitations period is also tolled for the time during which an appeal from a post-conviction decision could be filed even if no appeal is filed.  *Id*. at 424.  The limitations period, however, is not tolled during the ninety days a petitioner has to file a petition for a writ of certiorari in the United States Supreme Court regarding a judgment denying a state post-conviction motion.  *See Stokes v. Dist. Attorney of Phila.*, 247 F.3d 539, 542 (3d Cir. 2001).

Petitioner filed her Rule 61 motion on September 16, 2015, approximately nine months after AEDPA's limitations period expired on December 2, 2014.  Therefore, the Rule 61 motion has no statutory tolling effect.

Petitioner's motion for modification of sentence, filed on October 17, 2016 and approximately one year and ten months after the expiration of AEDPA's limitations period, also has no statutory tolling effect.  Thus, the Petition is time-barred, unless equitable tolling applies.

### B.  Equitable Tolling

The one-year limitations period may be tolled for equitable reasons in rare circumstances when the petitioner demonstrates "(1) that [s]he has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way and prevented timely filing."  *Holland*, 560 U.S. at 649-50.  With respect to the diligence inquiry, equitable tolling is not available where the late filing is due to the petitioner's excusable neglect.  *Id.* at 651-52.  As for the extraordinary

circumstance requirement, "the relevant inquiry is not whether the circumstance alleged to be extraordinary is unique to the petitioner, but how severe an obstacle it creates with respect to meeting AEDPA's one-year deadline." *Pabon v. Mahanoy*, 654 F.3d 385, 401 (3d Cir. 2011). Notably, an extraordinary circumstance will only warrant equitable tolling if there is "a causal connection, or nexus, between the extraordinary circumstance [] and the petitioner's failure to file a timely federal petition." *Ross v. Varano*, 712 F.3d 784, 803 (3d. Cir. 2013).

Here, Petitioner does not explicitly assert any reason justifying the application of the equitable tolling doctrine to the circumstances of her case.  Nevertheless, the Court construes her presentation of an affidavit from Emory, dated June 29, 2018, as an attempt to demonstrate her actual innocence in order to trigger equitable tolling.  (D.I. 6 at 18-22; D.I. 26)  In his affidavit, Emory claims that he provided false information to prosecutors in his September 11, 2013 proffer regarding Petitioner's knowledge about the robbery.  (D.I. 6 at 18-21)  Emory's affidavit asserts that: (1) he was "dishonest about a few things" when he gave his statement/confession to prosecutors; (2) Petitioner "honestly never knew about any robbery [he] was considering to do"; (3) he had "just asked her for a ride to pick up some pills and meth from someone"; (4) if Petitioner knew what he was considering to do, she "would [have] absolutely not agreed to give [him] the ride anywhere, [b]ut in truth [he] would [have] forced her anyway"; (5) Petitioner dropped him off at the "intersection by the pallet company and down the [road] from the Cashwells home"; (6) Petitioner did not see the gun the night of the murders; (7) phone records show that Petitioner was a mile or two away at the time of the robbery; (8) Petitioner picked him up at the side of the road a little bit down from the Cashwells; (9) Petitioner could not tell that there were guns in the blanket that he put in the back seat after she picked him up; (10) he treated

10

Petitioner badly in the past and had "smack[ed] her in the mouth or usually something worse for asking too many questions or putting her nose in something she had no business in;" and (11) he lied to prosecutors because he did not want Petitioner to be free to find another man while he was in prison.  (D.I. 6 at 18-21)

In *McQuiggin v. Perkins*, the Supreme Court held that a credible claim of actual innocence may serve as an "equitable exception" that can overcome the bar of AEDPA's one-year limitations period.  *McQuiggin v. Perkins*, 569 U.S. 383, 386, 401 (2013); *see also Satterfield v. Dist. Attorney of Phila,* 872 F.3d 152, 162 (3d Cir. 2017) ("*McQuiggin* allows a petitioner who makes a credible claim of actual innocence to pursue his or her constitutional claims even in spite of AEDPA's statute of limitations by utilizing the fundamental-miscarriage-of-justice exception.").  The *McQuiggin* Court, however, cautioned that "tenable actual-innocence gateway pleas are rare," and a petitioner only meets the threshold requirement by "persuad[ing] the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."  *McQuiggin*, 569 U.S. at 386. An actual innocence claim must be based on "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence [] that was not presented at trial."  *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

"Courts have historically viewed recantation testimony with great suspicion."  *Landano v. Rafferty*, 856 F.2d 569, 572 (3d Cir. 1988).  "As a general matter, a recantation in the absence of corroborating evidence or circumstances will probably fall short of the standard of reliability contemplated by *Schlup*."  *Howell v. Sup't Albion SCI*, 978 F.3d 54, 60 (3d Cir. 2020).  A court considering whether a claim of actual innocence premised on a recantation satisfies *Schlup*

11

should analyze the recantation "on an individual and fact-specific basis." *Howell*, 978 F.3d at 60.

In this case, Petitioner has provided the following evidence in addition to Emory's affidavit: (1) a DOC mental health report dated July 11, 2013 indicating the medications Petitioner was taking on that date (D.I. 27 at 2); (2) a Supplemental DNA Laboratory Report dated February 26, 2013 indicating the results of a supplemental DNA analysis performed on weapons and items of clothing (D.I. 27 at 3-12); (3) a transcribed copy of Emory's recorded police interview on April 28, 2012 (D.I. 26 at 33-62); (4) transcribed copies of Petitioner's recorded police interviews on April 27, 2012; May 1, 2012; May 8, 2012; December 21, 2012 (D.I. 26 at 63-232;) and (5) a forensic firearm report identifying the firearms obtained during the investigation and indicating which firearm was fired (D.I. 26 at 233-248). Although Petitioner does not explicitly assert that she is presenting this evidence to support her instant allegation of actual innocence, the Court presumes that she has provided the reports and interviews to both demonstrate her innocence and corroborate Emory's recantation affidavit. Additionally, in her Reply to the State's Answer, Petitioner asserts that she did not know about Emory's plan to rob and/or kill the Cashwells; rather, she states that she accompanied him that night in order to get drugs, something she claims she and Emory often did at Hickman Crossroads. (D.I. 26 at 8)

After reviewing Emory's affidavit in context with the "old" evidence in the record and Petitioner's alleged "new" evidence, the Court concludes that Emory's affidavit does not constitute new reliable factual evidence of Petitioner's actual innocence as required by *McQuiggin* and *Schlup*. To begin, the following statements in the affidavit are not "new" because they mirror the statements Emory made during his 2013 proffer to prosecutors: (1)

Emory never told Petitioner of his plan to rob the Cashwells; (2) Petitioner dropped him off near the scene of the crime; (3) Petitioner never exited the car and was a few miles away during the robbery until Emory called her to pick him back up; and (4) Emory abused Petitioner in the past.

In turn, the following additional evidence that existed at the time of Petitioner's plea demonstrates the unreliability of Emory's recantation assertions: (1) the prison recordings of phone calls between Emory and Petitioner indicate Petitioner was aware of Emory's "plan" to obtain a substantial amount of money after his release from prison, because they include Emory's statement that Petitioner should get that "thing" in the camper and make sure it had shells, and also his statement to Petitioner that he would get them a new house upon his release from prison (D.I. 14 at 5, 19); (2) Petitioner dropped Emory off in a remote rural area close to the victims' home; (3) the circumstances indicate a strong likelihood that Petitioner saw Emory emerge from the car carrying a shotgun; (4) when Petitioner picked up Emory a short time later, he was in possession of a large amount of cash; (5) Petitioner benefitted from the proceeds of the crime; (6) Petitioner knew the Cashwells had been murdered; (7) Petitioner helped to conceal the likely murder weapon; and (8) Petitioner lied to the police during numerous interviews.  (D.I. 14 at 19)

The transcripts of the recorded police interviews and the three reports (mental health, DNA, firearm forensics) Petitioner has provided in this proceeding do not constitute new reliable evidence of Petitioner's innocence or demonstrate the reliability of Emory's affidavit, because the reports were available when Petitioner entered her plea.  As for Petitioner's contention in her Reply that she only accompanied Petitioner on the night of the murders because they were

planning to buy drugs, the following additional statement in her Reply about her knowledge of

the gun's whereabouts casts doubt on the veracity of that contention:

> I was the one who told the 2 detectives almost everything they
> knew about all our [Petitioner's and Emory's] whereabouts from
> Sat. 4/21 till the day they arrested us.  Telling them everything I
> could remember/think of.  I was the one who told them about the
> gun & where it was & where they could find it.  At this point I was
> willing to help in any way I could.  I've included my interview
> with them as well.  I never lied.

(D.I. 26 at 7)

Moreover, courts in the Third Circuit have rejected actual innocence claims asserted to

overcome a time-bar when, as here, the petitioner pled guilty to the offenses of conviction.  *See,*

*e.g., Hamilton v. Estock*, 2020 WL 7391270, at *4 (M.D. Pa. Dec. 16, 2020); *Madison v.*

*McGinley*, 2019 WL 2591296, at *4 (E.D. Pa. May 3, 2019) (collecting cases).  It is well-settled

that "[s]olemn declarations in open court carry a strong presumption of verity" that creates a

"formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S.

63, 74 (1977).  The transcript of Petitioner's plea colloquy contains her clear and explicit

statements that she understood the charges against her; she had discussed her case with defense

counsel and understood all of the rights she was waiving by entering a guilty plea; nobody had

forced her to plead guilty or had promised her anything other than what was in the plea

agreement in exchange for her plea; and she was pleading guilty because she was, in fact, guilty.

(D.I. 15-2 at 13-29)  Significantly, during the plea colloquy, the Superior Court summarized the

situation as follows:

> I understand there is a co-defendant.  I understand that in all likelihood
> part of the State's theory is that – there is a section of the Code, the 3507 –
> you and your co-defendant, you and your ex-boyfriend, made certain
> plans, ideas, and that he carried out much of this, but that you aided and

> abetted and assisted him in this.  […] So you understand that, even if you
> are not the person who pulled the trigger, if you are involved in the
> planning, you are just as guilty?

(D.I. 6-2 at 79)  The Superior Court asked Petitioner if she understood "the State's theory and the

State's evidence," and she replied affirmatively.  (*Id*.)  The Superior Court also asked, "You

know what you did or didn't do," to which Petitioner answered, "Yes, Your Honor."  (*Id*. at 80)

She also agreed that: (1) she was guilty of the criminally negligent homicides of Harvey and

Carolyn Cashwell; (2) with Emory, she plotted and planned in the commission of first degree

burglary; (3) she was aware that a .22 caliber rifle was used during the crime; (4) she went there

"for the purposes of taking what they had"; (5) she did, in fact, accomplish that and much was

stolen; and (5) in summary, she was guilty of all six offenses.  (*Id*. at 80-81)  The Superior Court

accepted Petitioner's plea as being made "knowingly, voluntarily, and intelligently."  (*Id*. at 89)

After considering Emory's affidavit in context with all of the evidence – both old and

"new" – along with Petitioner's voluntary and knowing guilty plea, the Court concludes that

Petitioner has failed to provide evidence sufficiently reliable and persuasive enough to satisfy

*Schlup*'s actual innocence gateway standard.  Thus, Emory's affidavit does not warrant equitably

tolling the limitations period.

In turn, to the extent Petitioner's late filing was due to a lack of legal knowledge or

miscalculation of the one-year filing period, such circumstances do not warrant equitably tolling

the limitations period.  *See Taylor v. Carroll*, 2004 WL 1151552, at *5-6 (D. Del. May 14,

2004).  For all of these reasons, the Court concludes that equitable tolling is not justified on the

facts as presented by Petitioner.  Accordingly, the Court will dismiss the instant Petition as time-barred.[4]

## III.    CERTIFICATE OF APPEALABILITY

A district court issuing a final order denying a § 2254 petition must also decide whether to issue a certificate of appealability.  *See* 3d Cir. L.A.R. 22.2 (2011); 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on procedural grounds without reaching the underlying constitutional claims, the court is not required to issue a certificate of appealability unless the petitioner demonstrates that jurists of reason would find it debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court concludes that the instant Petition is time-barred.  In the Court's view, reasonable jurists would not find this conclusion to be debatable.  Therefore, the Court will not issue a certificate of appealability.

## IV.    CONCLUSION

For the reasons discussed, the Court will dismiss the Petition as time-barred.  An appropriate Order will be entered.

---

[4]Having determined that the Petition is time-barred, the Court will not address the State's alternative argument for dismissal.

16